FILED
2015 Jun-10  PM 02:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| ANTHONY SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:13-cv-00852-SLB-JEO |
| | ) | |
| JEFFERSON COUNTY SHERIFF, | ) | |
| *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

The plaintiff, Anthony Smith, has filed a *pro se* amended complaint pursuant to 42 U.S.C. § 1983, alleging that rights, privileges, or immunities afforded him under the Constitution or laws of the United States were abridged.   The plaintiff is currently incarcerated at Staton Correctional Facility in Elmore, Alabama.   The plaintiff names as defendants Jefferson County Deputy Sheriffs John Leon, Terry Scott, Neil Sanders, Billy Watts, and Darris Hughes.   The plaintiff seeks monetary and injunctive relief.

In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(1), the amended complaint was referred to the undersigned magistrate judge for a preliminary report and recommendation.   *See McCarthy v. Bronson*, 500 U.S. 136 (1991).

1

# I. <u>Procedural History</u>

On May 28, 2014, the court entered an Order for Special Report, directing the Clerk to forward a copy of the amended complaint to Defendants Leon, Scott, Sanders, Watts, and Hughes and requesting that they file a Special Report addressing the plaintiff's factual allegations.  (Doc. 8).   The court advised the defendants the Special Report should be accompanied by sworn statements and, if appropriate, would be considered as a motion for summary judgment, filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (*Id*.).   By the same order, the court advised the plaintiff that after he received a copy of the defendants' Special Report, he should file counter-affidavits if he wished to rebut the matters presented in the Special Report.  (*Id*.).

On July 18, 2014, the defendants filed a Special Report, accompanied by affidavits and other documents.  (Doc. 14).   The court notified the plaintiff the defendants' Special Report would be construed as a motion for summary judgment and he would have twenty days to respond by filing affidavits and other material if he chose.  (Doc. 15).   The court also advised the plaintiff of the consequences of any default or failure to comply with Fed. R. Civ. P. 56.   *Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).   The plaintiff filed several responses.  (Docs. 16, 17, 21).

## II.  <u>Summary Judgment Standard</u>

In considering a motion for summary judgment, the court must determine whether the moving party is entitled to judgment as a matter of law.  Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000).  The burden of proof is upon the moving party to establish his *prima facie* entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1989).  Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Bennett v. Parker*, 898 F.2d 1530, 1532-33 (11th Cir. 1990).

As the Eleventh Circuit Court of Appeals has explained:

Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prime facie case.  "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case

> necessarily renders all other facts immaterial." Thus, under such
> circumstances, the public official is entitled to judgment as a matter of
> law, because the plaintiff has failed to carry the burden of proof. This
> rule facilitates the dismissal of factually unsupported claims prior to
> trial.

*Bennett v. Parker*, 898 F.2d at 1532 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). However, any "specific facts" pled in a *pro se* plaintiff's sworn complaint must be considered in opposition to summary judgment. *See Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986).

### III.   Summary Judgment Facts

Based on the foregoing summary judgment standard, the following facts are undisputed or, if disputed, taken in a light most favorable to the plaintiff.[1]

On November 8, 2011, at about 10:50 p.m., Jefferson County Deputy Sheriff John Leon received a call concerning a burglary in progress at 6904 Highway 75 South. (Doc. 14-1, Leon Aff. ¶ 4). Defendant Leon learned that the suspect, an armed white male, had fled the scene in a white pick-up truck "with a busted-out passenger-side window." (*Id*.). Defendant Leon was in the area of the burglary when he saw a pick-up truck matching the description of the suspect's vehicle. (*Id.* at ¶ 5). Leon followed the pick-up truck and activated his lights, but the driver of the pick-up truck, who was later identified as the plaintiff, Anthony Smith, did not

---

1 Factual disputes made by the defendants are addressed in footnote form.

4

stop.  (*Id.*).   Deputy Terry Scott was in the area of the burglary when he saw Leon in pursuit of a white pick-up truck.  (Doc. 14-2, Scott Aff. ¶ 5).   Scott got behind Leon's patrol car to provide back-up.  (*Id.* at ¶ 5-6).   Defendants Leon and Scott continued to follow the pick-up truck and Leon instructed the plaintiff to pull over using his patrol car's public announcement intercom.  (Doc. 14-1, Leon Aff. ¶ 5).   The plaintiff did not stop immediately, but made a few turns before finally pulling over.   (Doc. 14-2, Scott Aff. ¶ 5).

Defendant Leon instructed the plaintiff to turn off the vehicle and exit the vehicle.  (Doc. 14-1, Leon Aff. ¶ 6).   The plaintiff complied.  (*Id.*).   Because Leon had been advised that the plaintiff was armed, he instructed the plaintiff to get on the ground and keep his hands where Leon could see them.  (*Id.*).   The plaintiff got on the ground; however, despite Defendant Leon's repeated instruction to do so, the plaintiff would not lie still and would not keep his hands where Defendant Leon could see them.  (*Id.* at ¶ 7).   As Defendant Leon approached the plaintiff, he could smell alcohol on him and the plaintiff appeared disoriented.  (*Id.* at ¶ 9).   The plaintiff also put his hand in his pocket. [2]  (*Id.*).

---

2      Because Leon believed the plaintiff was armed when the plaintiff reached into his pocket, Leon states he placed his knee into the small of the plaintiff's back to restrict his movement and told him to remove his hand from his pocket.  (Doc. 14-1, Leon Aff. ¶ 9).   Defendant Leon states that when the plaintiff removed his hand, some money fell out of his pocket onto the ground. (*Id.*).   With the plaintiff's movement restricted, Defendant Leon claims he and Defendant Scott were able to handcuff the plaintiff.  (*Id.* at ¶ 10).   Defendant Leon denies that he punched or

After pulling the plaintiff over, Defendant Scott went around to the passenger side of the pick-up truck. (Doc. 14-2, Scott Aff. ¶ 6).   Scott recalls that he was trying to see if the pick-up truck had a broken out passenger-side window because that would have matched the description of the burglary suspect's vehicle.[3]   (*Id*.).

On November 8, 2011, at about 10:50 p.m., Deputy Sheriff Neil Sanders and Sergeant Billy Watts, who was also a Deputy Sheriff at the time, were advised of a burglary in progress at 6904 Highway 75 South.   (Doc. 14-3, Sanders Aff. ¶ 4; Doc. 14-4, Watts Aff. ¶ 4).   Both Sanders and Watts went to the scene of the burglary and interviewed the victim.   (*Id*.).   The victim informed Defendants Sanders and Watts that the suspect had broken into his house and car, the suspect fled when the victim discovered him, and the suspect had threatened the victim with a knife.   (*Id*.).

While Defendants Sanders and Watts were interviewing the victim, they were informed the plaintiff had been detained in connection with the burglary.   (Doc. 14-3, Sanders Aff. ¶ 5; Doc. 14-4, Watts Aff. ¶ 5).   Defendant Sanders left the victim's house to go to the scene of where the plaintiff was detained.   (*Id*.).

---

struck the plaintiff and denies that he saw any other deputy punch or strike the plaintiff.   (Doc. 14-1, Leon Aff. ¶ 12).   He states that at no point did he deploy his taser on the plaintiff and did not see any other deputy use his taser on the plaintiff.   (*Id*.).

3      Defendant Scott states that after he confirmed the broken out passenger-side window, he then went to the driver's side of the pick-up truck to assist Defendant Leon in handcuffing the plaintiff.   (Doc. 14-2, Scott Aff. ¶ 7).   He states that he and Defendant Leon were able to handcuff the plaintiff even though they had to grab his arms in order to keep him still.   (*Id*.).   Defendant Scott contends that he did not punch or strike the plaintiff or use his taser on him.   (*Id*. at ¶ 9).   He also denies seeing any other deputy punch, strike, or tase the plaintiff.   (*Id*.).

Defendant Watts stayed to finish getting the victim's statement.   (Doc. 14-4, Watts Aff. ¶ 5).   After Defendant Watts obtained the victim's statement, he also went to where the plaintiff was being detained. [4]   (*Id*. at ¶ 6).

The plaintiff alleges that Defendants Leon, Scott, Sanders, and Watts used excessive force against him during his arrest.   (Doc. 7 at 5).   The plaintiff claims the defendants used their fists and elbows to strike him in the head repeatedly, resulting in facial lacerations, trauma to his eye socket, contusions, blackouts, and a possible concussion.   (*Id*.).   He states the defendants tased him more than twice in his back area, which caused him temporary and permanent loss of function in his shoulder, bicep, and back muscles.   (*Id*.).   The plaintiff contends the defendants also struck him in his back and groin area, causing trauma to his kidneys and blood in his urine.   (*Id*.).   The plaintiff alleges the officers individually used excessive

---

[4]   Defendant Sanders states that when he left the victim's house and arrived on the scene, the plaintiff was already in handcuffs and subdued before he had any interaction with the plaintiff. (Doc. 14-3, Sanders Aff. ¶ 6).   Defendant Sanders denies assaulting the plaintiff or deploying his taser on the plaintiff.   (*Id*. at ¶ 11).   He further denies seeing any other deputy assault the plaintiff or tase him.   (*Id*.).   Defendant Sanders states that the only contact he had with the plaintiff was getting him in and out of his patrol car.   (*Id*.).

Defendant Watts claims that when he left the victim's house and arrived on the scene, the plaintiff was already detained in the back of Defendant Sanders's patrol car.   (Doc. 14-4, Watts Aff. ¶ 6).   Defendant Watts denies assaulting or tasing the plaintiff.   (*Id*. at ¶ 9).   Defendant Watts also denies seeing any other deputy assault or tase the plaintiff.   (*Id*.).   Watts claims he never made any physical contact with the plaintiff during or after his arrest.   (*Id*.).

force against him and failed to intervene when other officers assaulted him.[5]   (Doc. 7 at 5).

The defendants put the plaintiff in the back of Defendant Sanders's patrol car so Sanders could take him back to the burglary victim's house for identification. (Doc. 14-3, Sanders Aff. ¶ 6).   Defendant Watts accompanied Defendant Sanders to the victim's house.   (*Id*.).   The victim identified the plaintiff as the burglar.   (*Id*.).

Defendant Sanders then took the plaintiff to the Jefferson County Jail to be booked.   (*Id*. at ¶ 7).   On the way to the Jail, the plaintiff acted as if "he were in some sort of altered mental state."   (*Id*.).   It was later determined that the plaintiff was also a suspect in a series of robberies that occurred earlier that day in Birmingham.   (Doc. 14-3, Sanders Aff. ¶ 8).   Defendant Sanders left the plaintiff at the Jail to be booked and did not participate in the booking process.   (*Id*. at ¶ 9).

---

5      The court notes that it is not clear from the plaintiff's amended complaint when officers handcuffed him.   The plaintiff contends in one of his responses that he did not resist arrest or being handcuffed and that the defendants acted while he was being handcuffed and "even after [he] was handcuffed."   (Doc. 21 at 2).   However, the plaintiff does not make these allegations in the form of an affidavit or under penalty of perjury as instructed in the court's order dated July 31, 2014.   (Doc. 15).   The plaintiff merely cites his amended complaint in support of this claim. (Doc. 21 at 2).   But as stated previously, the plaintiff's amended complaint does not state whether the plaintiff was in handcuffs at this point.

Although the plaintiff later amended his complaint, the court notes that the plaintiff alleged in his original complaint that officers pulled him from his vehicle, threw him forcefully onto the asphalt and put their knees into his back while elbowing him in his head.   (Doc. 1 at 5).   He states that officers handcuffed one of his arms but his other arm was twisted under his body.   (*Id*.).   As the plaintiff attempted to free his arm, officers tased him.   (*Id*.).   Based on the plaintiff's allegations in the original complaint, the plaintiff was not secured in handcuffs when he claims officers assaulted him.

Jail records indicate the plaintiff was booked into the Jail around 12:06 a.m. on November 9, 2011.  (Doc. 14-6, Eddings Aff. ¶ 5).  The Jail has a multi-step booking process.  (*Id*. at ¶ 3).  The incoming inmate is asked a series of questions, the inmate's responses are then entered into the Jail's database, the inmate is placed into a Jail uniform, the inmate undergoes a medical screening, and the inmate is photographed.  (*Id*.).  The entire booking process takes place on Level 1 of the Jail and the inmate is placed in a holding cell on Level 1 as he is awaiting the next step in the booking process.  (*Id*. at ¶ 4).

The plaintiff denied having any serious injury or illness at the time of his booking.  (Doc. 14-7 at 9).  Jail medical staff noted that the plaintiff was uncooperative, irritable, and anxious.  (*Id*. at 23).  Medical staff also noted the plaintiff had multiple abrasions on his face and arms.[6]  (*Id*.).

The plaintiff claims Deputy Sheriff Darris Hughes attacked him in the booking area's holding cell on or about November 8, 2011.  (Doc. 7 at 5-6).  He states Defendant Hughes struck him in the head twice, threw the plaintiff on the concrete and tile floor, causing the plaintiff to strike his head on the floor and knocking him unconscious.  (*Id*. at 6).  The plaintiff asserts Defendant Hughes

---

6    The defendants assert that at some point during the plaintiff's booking process, the plaintiff attempted to hurt himself by scratching his face and arms while he was in the holding cell. (Doc. 14-6, Eddings Aff. ¶ 5; Doc. 14-7 at 8, 9).

then dragged the plaintiff out of the holding cell and out of the camera's range. (*Id*.).   The plaintiff claims he sustained "lacerations" to his back.[7]   (*Id*.).

On November 10, 2011, after the plaintiff was released from the Jail, he was seen by Dr. Paul Roberts at Southeast Urgent Care.   (Doc. 16 at 2, 25; Doc. 17 at 3). The plaintiff complained that he had been assaulted by officers two days earlier. (*Id*.).   Dr. Roberts observed multiple abrasions to the plaintiff's face, and diagnosed him with a closed head injury and concussion.   (Doc. 16 at 25).   Dr. Roberts referred the plaintiff for a CT scan.   (Doc. 16 at 25).   On the same date, the plaintiff underwent a CT scan which appeared normal.   (*Id.* at 26). Specifically, no intracranial hemorrhage, mass effect, or shift in midline structures was detected. (*Id*.).   Additionally, the plaintiff's ventricles appeared to be normal in size and position and his osseous structures appeared normal.   (*Id*.).

---

7     Captain Ronald Eddings of the Jefferson County Sheriff's Office states that Deputy Darris Hughes was not assigned to work in the booking area on Level 1, did not work in the booking area, and was not at the Jail at the time the plaintiff was booked.   (Doc. 14-6, Eddings Aff.¶ 7). Defendant Hughes claims that in November 2011, he was assigned to work on Levels 8 and 9, which houses violent male inmates.   (Doc. 14-8, Hughes Aff. ¶ 5).   Additionally, Defendant Hughes states that he worked the day shift in November 2011, which started at 6:00 a.m. and ended at 2:00 p.m., and therefore he was not present at the Jail when the plaintiff was booked.   (*Id*. at ¶ 6).

## IV.    Discussion

### A.    Official Capacity Claims.

To the extent the plaintiff's constitutional claims are brought against the defendants in their official capacities for monetary relief, the plaintiff's claims are due to be dismissed based on sovereign immunity.   It is well established that the Eleventh Amendment to the United States Constitution bars 42 U.S.C. § 1983 claims against the state or an agency of the state.   *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).   Likewise, lawsuits against a state official in his or her official capacity are suits against the state when "the state is the real, substantial party in interest."   *Id*. at 101.

In *Parker v. Williams*, the Eleventh Circuit Court of Appeals held that the Eleventh Amendment bars § 1983 lawsuits against county sheriffs sued in their official capacities.   862 F.2d 1471, 1475-76 (11th Cir. 1989), *overruled on other grounds by Turquitt v. Jefferson County, Ala.*, 137 F.3d 1285 (11th Cir. 1998).   The Eleventh Circuit later held that a sheriff's Eleventh Amendment immunity also extends to deputy sheriffs because of their "traditional function under Alabama law as the sheriff's alter ego."   *Carr v. City of Florence, Alabama*, 916 F.2d 1521, 1527 (11th Cir. 1990).   Therefore, the defendants are absolutely immune from damages liability in their official capacities.

11

Based on the foregoing, the defendants' motion for summary judgment on the plaintiff's claims against them in their official capacities for monetary relief is due to be granted.   The remainder of this report and recommendation will address plaintiff's claims against the defendants in their individual capacities.

**B.**     **Fourth Amendment – Defendants Leon, Scott, Sanders & Watts.**

1.     Excessive Force.

The plaintiff alleges that on November 8, 2011, Defendants Leon, Scott, Sanders, and Watts used excessive force against him during his detention and arrest on suspicion of burglary. (Doc. 7 at 5).   The plaintiff claims Leon, Scott, Sanders, and Watts repeatedly struck him in his head with their fists and elbows. (*Id*.).   The plaintiff further claims the defendants struck the plaintiff in the back and groin, and tased him more than twice in his back area.   (*Id*.).   The plaintiff alleges that as a result of the defendants' use of excessive force, he sustained facial lacerations, trauma to his eye socket, contusions, blackouts, a possible concussion, temporary and permanent loss of function in his shoulder, bicep, and back muscles, trauma to his kidneys, and blood in his urine.   (*Id*.).

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest."   *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002).   However, it

has long been recognized that the right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989).   Indeed, "the typical arrest involves some force and injury."   *Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008). Courts consider excessive force claims "under the Fourth Amendment's objective reasonableness standard."   *Crenshaw v. Lister*, 556 F.3d 1283, 1290 (11th Cir. 2009) (quotation marks omitted).

The reasonableness standard asks whether the force applied "is objectively reasonable in light of the facts confronting the officer," a determination made "from the perspective of a reasonable officer on the scene" and not "with the 20/20 vision of hindsight."   *Id*.   A court looks at the totality of the circumstances, "'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'"   *Lee*, 284 F.3d 1188 at 1197-98 (quoting *Graham v. Conner*, 490 U.S. 386, 396 (1989)).   Courts also consider "the need for the application of force, . . . the relationship between the need and amount of force used, and . . . the extent of the injury inflicted."   *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002).   Courts do not, however, consider whether an officer acted in good faith or sadistically and maliciously when evaluating a Fourth Amendment

13

excessive force claim.   *Graham*, 490 U.S. at 394, 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."); *Lee*, 284 F.3d at 1198 n.7.

Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."   *Graham*, 490 U.S. at 396-97.   The Eleventh Circuit Court of Appeals has stated:

> In making an excessive force inquiry, we are not to view the matter as judges from the comfort and safety of our chambers, fearful of nothing more threatening than the occasional paper cut as we read a cold record accounting of what turned out to be the facts.   We must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal.

*Crosby v. Monroe County*, 394 F.3d 1328, 1333-34 (11th Cir. 2004).

The defendants argue they are entitled to qualified immunity on the plaintiff's Fourth Amendment excessive force claims.   "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which reasonable person would have known."   *Vinyard v. Wilson*, 311 F.3d 1340,

14

1346 (11th Cir. 2002) (quotation marks omitted).  To obtain qualified immunity, the government official "must first prove that he was acting within the scope of his discretionary authority when the alleged wrongful acts occurred."  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quotation marks omitted).  "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity in not appropriate." *Id*.  The plaintiff must show that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004) (footnote omitted).

There is no dispute that Defendants Leon, Scott, Sanders, and Watts were acting within the scope of their discretionary authority when they detained and arrested the plaintiff on suspicion of burglary.  *See Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994) ("discretionary authority" includes "all actions of a government official that (1) 'were undertaken pursuant to the performance of his duties,' and (2) were 'within the scope of his authority'") (quoting *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988)).  Therefore, to defeat qualified immunity, the plaintiff must establish a genuine issue of material fact regarding whether the officers violated his constitutional rights.

The plaintiff does not dispute the following: (1) the defendants had been notified of a burglary in progress and advised that the suspect was an armed white male who had fled the scene in a white pick-up truck with a broken out passenger-side window; (2) Defendant Leon was in the vicinity at the time and saw a pick-up truck that matched the description of the suspect's vehicle; (3) the plaintiff failed to stop after Defendant Leon began to follow him and activated his lights; and (4) as Defendants Leon and Scott followed the plaintiff, Leon instructed the plaintiff to pull over using the patrol car's public announcement intercom, but the plaintiff continued to make more turns before finally pulling over.

While the plaintiff complied with officers' instructions to get out of his car and onto the ground, the plaintiff does not contradict Defendant Leon's affidavit testimony that once the plaintiff was on the ground, he would not be still despite Defendant Leon's specific instructions to do so, he smelled of alcohol and appeared disoriented, he would not put his hands where Leon could see them, and he put his hand in his pocket. Based on the undisputed facts, it was not objectively unreasonable for officers to use some degree of force to get the plaintiff to comply with lawful commands to restrain him.[8]

---

8    While the plaintiff contends in his response that he was not resisting officers, he does not dispute the foregoing facts or point to any facts that would have made it objectively unreasonable for the defendants to believe that he did pose a threat.

However, even if the defendants were justified in using some force against the plaintiff to restrain him, construing the facts in a light most favorable to the plaintiff, Defendants Leon, Scott, Sanders, and Watts used an amount of force against him that far exceeded the amount needed to restrain him.  Instead, the defendants repeatedly struck the plaintiff in the head, back, and groin, and tased him.

On the other hand, Defendant Leon claims that when the plaintiff reached into his pocket, Defendant Leon placed his knee in the small of the plaintiff's back and, together with assistance from Defendant Scott, was able to handcuff the plaintiff. Defendants Leon and Scott claim this was the only amount of force used against the plaintiff during the arrest.

Defendants Watts and Sanders contend that they were not even on the scene when Leon and Scott detained the plaintiff. Rather, they allege they were at the victim's house getting a statement from him. Watts and Sanders claim that when they arrived on the scene where the plaintiff had been stopped, he was already in handcuffs and sitting in the back of the patrol car. All defendants involved with the plaintiff's arrest deny striking, punching, or tasing the plaintiff.

It is well established that assessing the credibility of the allegations made by the plaintiff or defendant is beyond the scope of a trial court's ruling on a motion for summary judgment.  *See, e.g., Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 255

(1986); *see also, Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1986).   The facts presented by both parties show that a genuine dispute of material fact exists between the plaintiff's and the defendants' version of the events in connection with the plaintiff's November 8, 2011 arrest. Therefore, Defendants Leon, Scott, Watts, and Sanders' motion for summary judgment on the plaintiff's Fourth Amendment excessive force claims is due to be denied.

The defendants contend that the plaintiff did not suffer a serious injury following his arrest.   The plaintiff submits pictures of himself and medical reports from his personal physicians in support of his injuries.   (Doc. 16, Ex. A).   The pictures and medical reports note that the plaintiff sustained multiple abrasions on his face and arms.[9]   (Doc. 14-7 at 2; Doc. 16 at 25).   While Dr. Roberts, a physician at an urgent care clinic, initially diagnosed the plaintiff with a closed head injury and concussion two days after the alleged assault, the plaintiff does not dispute that a CT scan of his head later the same day showed no injury.   (Doc. 16 at 26).   Moreover, there is no medical evidence in the record to support that the plaintiff sustained "trauma to his kidneys," permanent loss of function in his shoulder, bicep, or back muscles, blackouts, or eye trauma as a result of the

---

9      Other medical records in the plaintiff's response indicate he suffers from a sleep disorder and epilepsy.   (Doc. 16).   It is not readily apparent how these conditions relate to the plaintiff's claims of injury since he appears to have experienced symptoms of these conditions prior to his arrest on November 8, 2011. (*Id*. at 18, 28-33).

defendants' alleged use of force.   (Doc. 7 at 5).   Neither does the plaintiff dispute that when he arrived to the Jefferson County Jail following this alleged assault, he denied any serious injury at all.   (Doc. 14-7 at 9).

Even if the plaintiff sustained only multiple abrasions during his arrest as a result of the defendants' conduct, the extent of injury suffered is but one factor to be considered in determining whether the use of force was unreasonable.   *See Saunders v. Duke*, 766 F.3d 1262, 1270 (11th Cir. 2014) (applying same rationale to Fourth Amendment excessive force case as used in actions brought under Eighth Amendment where an individual who is gratuitously beaten by officers does not lose his ability to pursue an excessive force claim merely because he does not suffer serious injury).   Even if the plaintiff did not sustain serious injury, his allegations, if proven at trial, could establish that the defendants' use of force was disproportionate to the amount of force needed to restrain him.   *Slicker v. Jackson*, 215 F.3d 1225, 1232-33 (11th Cir. 2000) (holding that a plaintiff claiming excessive force under the Fourth Amendment can seek nominal damages if he does not have compensable injuries).

Because the evidence taken in the light most favorable to the plaintiff raises a question of fact as to whether Defendants Leon, Scott, Sanders, and Watts used excessive force against him during his detention and arrest on November 8, 2011,

the defendants' motion for summary judgment on qualified immunity grounds is due to be denied.   *See Slicker*, 215 F.3d 1225, 1231-32.

     2.    <u>Failure to Protect</u>.

The plaintiff alleges Leon, Scott, Sanders, and Watts each had a duty to intervene while his fellow officers allegedly used excessive force against the plaintiff but they failed to do so.   An officer can be liable for failing to intervene when another officer uses excessive force.   *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 924 (11th Cir. 2000) (citing *Ensley v. Soper*, 142 F.3d 1402, 1407-08 (11th Cir. 1998) ("[I]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in which presence, the officer is directly liable under Section 1983.")).   This liability arises only when the officer is in a position to intervene and fails to do so. *See Ensley*, 142 F.3d at 1407 ("[F]or an officer to be liable for failing to stop police brutality, the officer must be in a position to intervene[.]").

    According to the factual allegations presented by the plaintiff, Defendants Leon, Scott, Sanders, and Watts witnessed each other use excessive force against the plaintiff but failed to intervene and protect him.   This type of allegation, if proven, establishes that these defendants failed to intervene or protect him from assault at the hands of their fellow officers.   *See Skrtich v. Thornton*, 280 F.3d 1295, 1300-01

(11th Cir. 2002) ("[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for non-feasance.").

The defendants argue that they did not intervene to protect the plaintiff because no officer used excessive force against him during the course of his arrest. The defendants deny that any officer struck, punched, or tased the plaintiff.

As stated previously, assessing the credibility of the allegations made by a plaintiff or defendant is beyond the scope of a trial court's ruling on a motion for summary judgment. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also, Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). The facts presented by the parties show a genuine dispute over whether the defendants failed to intervene and protect the plaintiff from each officer's excessive use of force on November 8, 2011. Therefore, Defendants Leon, Scott, Sanders, and Watts's motion for summary judgment on the plaintiff's Fourth Amendment failure to protect claims is due to be denied.

The defendants argue that they are entitled to qualified immunity on the plaintiff's failure to protect claims. Again, there is no dispute that the defendants were acting in their discretionary capacities when they detained and arrested the plaintiff on suspicion of burglary. Therefore, the court must determine whether the

plaintiff's allegations, if true, establish a constitutional violation.  *Hope v. Pelzer*, 536 U.S. 730, 736 (2002).   If a constitutional right would have been violated under the plaintiff's version of the facts, "the next, sequential step is to ask whether the right was clearly established."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

First, the plaintiff's version of the facts – that Defendants Leon, Scott, Sanders and Watts individually failed to intervene and protect him while each officer took part in assaulting him – establishes a constitutional violation.  *See Skrtich v. Thornton*, 280 F.3d 1295, 1300-01 (11th Cir. 2002); *see also Davidson v. Cannon*, 474 U.S. 344, 348-49 (1986).   Second, the duty of an officer to protect an individual from assault by fellow officers had been clearly established for years prior to the defendants' alleged failure to intervene and protect the plaintiff on this occasion.  *See Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1560 (11th Cir. 1993), *as amended*, 14 F.3d 583 (11th Cir. 1994) ("A police officer has a duty to intervene when another officer uses excessive force."); *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986) ("[I]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983.").   As such, Defendants Leon, Scott, Sanders, and Watt's motion for summary judgment on the basis of qualified immunity is also due to be denied.

C.    **Fourteenth Amendment**

Excessive Force – Defendant Hughes.

The plaintiff alleges that on or about November 8, 2011, while he was being booked into the Jefferson County Jail, Deputy Sheriff Darris Hughes attacked him in the booking area's holding cell.  (Doc. 7 at 5-6).  He states Defendant Hughes struck him in the head twice, threw him on the concrete and tile floor, causing the plaintiff to strike his head on the floor and knocking him unconscious.  (*Id*. at 6).  The plaintiff claims Defendant Hughes then dragged the plaintiff out of the holding cell, and out of the camera's range.  (*Id*.).   The plaintiff claims he sustained "lacerations" to his back.   (*Id*.).

The plaintiff's excessive force claim against Defendant Hughes must be analyzed under the standard set forth by the United States Supreme Court in *Hudson v. McMillian*, 503 U.S. 1 (1992) and *Whitley v. Albers*, 475 U.S. 312 (1986).[10]   *See Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999).   In *Hudson v. McMillian*, the Supreme Court held that in assessing an inmate's excessive force claim, "the

---

10      The plaintiff had been arrested and placed in the custody of the Jefferson County Jail when he claims Defendant Hughes assaulted him.   Therefore, he was a pre-trial detainee at this time. "Claims involving the mistreatment of . . . pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners."   *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996).   However, the applicable standard is the same for claims involving the mistreatment of pre-trial detainees and convicted prisoners whether brought under the Eighth, Fifth or Fourteenth Amendments.   *See Daniel v. U.S. Marshal Serv.*, 188 Fed. App'x 954, 961-62 (11th Cir. 2006); *see also Bozeman v. Orum*, 422 F.3d 1265, 1271 (11th Cir. 2005) (citing *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996)).

core judicial inquiry is that set out in *Whitley*: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7.   In extending *Whitley* to all cases involving allegations of the use of force by prison officials, the Supreme Court reasoned:

> Many of the concerns underlying our holding in *Whitley* arise whenever guards use force to keep order.   Whether the prison disturbance is a riot or a lesser disruption, corrections officers must balance the need "to maintain or restore discipline" through force against the risk of injury to inmates.   Both situations may require prison officials to act quickly and decisively.   Likewise, both implicate the principle that "'[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'"

*Hudson*, 503 U.S. at 9 (citations omitted).

With these concerns in mind, the Supreme Court set out certain factors that should be considered when evaluating whether the force used was excessive. These factors include: (1) the need for application of force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by the responsible official; (4) any efforts to temper the severity of a forceful response; and (5) the extent of the injury suffered by the inmate.   *Id*. at 7; *see Hewett v. Jarrad*, 786 F.2d 1080, 1085 (11th Cir. 1986).

In applying the foregoing factors to the facts of a particular case, the Supreme Court has instructed:

24

> That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action. *See Johnson v. Glick*, 481 F.2d at 1033 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."). The Eighth Amendment's prohibition of "cruel and unusual" punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not a sort "'repugnant to the conscience of mankind.'"

*Hudson*, 503 U.S. at 9 (internal citations omitted).

The plaintiff claims Defendant Hughes viciously attacked him in the booking area's holding cell on or about November 8, 2011. The plaintiff alleges Hughes struck him in the head, threw the plaintiff onto the concrete floor and dragged him out of the cell.

However, Defendant Hughes states that he was not present when the plaintiff was booked into the Jail. Specifically, Hughes states that he worked the day shift in November 2011, which started at 6:00 a.m. and ended at 2:00 p.m. and, therefore, would not have been present at the Jail when the plaintiff was booked. (Doc. 14-8, Hughes Aff. ¶ 6). Additionally, Ronald Eddings, a Captain and Commander of the Jefferson County Jail, states that upon review of the time and assignment information from November, 2011, Defendant Hughes was not assigned to work in the booking area, did not work in the booking area, and was not at the Jail during the time the plaintiff was being booked.[11] (Doc. 14-6, Eddings Aff. ¶ 7).

---

11    The defendants have not offered the time and assignment information from November

The plaintiff's allegations, viewed in the light most favorable to the him, create a triable issue of fact as whether Defendant Hughes was present when the plaintiff was booked and used excessive force against him.   The plaintiff's testimony at trial that Hughes assaulted him is sufficient evidence from which a jury may infer that excessive force was used.   Defendant Hughes may testify that he was not present at the Jail at the time in question and, therefore, could not have used excessive force against the plaintiff as he alleges.   Hughes' testimony is likewise sufficient to permit the jury to find that he did not use excessive force against the plaintiff.   However, whether excessive force was used at all is an issue of fact for the jury to resolve.   The court cannot resolve this claim on summary judgment. Accordingly, Defendant Hughes' motion for summary judgment on the plaintiff's Fourteenth Amendment excessive force claim is due to be denied.

To the extent Defendant Hughes argues that he is entitled to qualified immunity with regard to the plaintiff's excessive force claim,

> a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution . . . . There is simply no room for a qualified immunity defense when the plaintiff alleges such a violation.   The only question, then, is whether the plaintiff has alleged facts sufficient to survive a motion for summary judgment.   If he has done so, that is the end of the inquiry.

2011 which Eddings relies upon to conclude Defendant Hughes was not at the Jail during this time.

*Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002) (citations omitted) (quoting *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)).   Because the plaintiff has alleged facts sufficient to survive a motion for summary judgment concerning his Fourteenth Amendment excessive force claim, Defendant Hughes' motion for summary judgment on the basis of qualified immunity is also due to be denied.

**D.**   **Plaintiff's Cross Motion for Summary Judgment**

The plaintiff purports to also move for summary judgment against the defendants.   (Doc. 21).   Because a genuine issue of material fact exists concerning the plaintiff's claims against the defendants, the plaintiff's motion for summary judgment is due to be denied for the same reasons articulated herein.

## RECOMMENDATION AND NOTICE OF RIGHT TO OBJECT

Accordingly, for the reasons stated above, the magistrate judge RECOMMENDS the following:

(1)   The defendants' motion for summary judgment on the plaintiff's claims against them in their official capacities for monetary relief be GRANTED and the claims be DISMISSED WITH PREJUDICE;

(2)   Defendants Leon, Scott, Sanders, and Watt's motion for summary judgment on the plaintiff's Fourth Amendment excessive force claims against them be DENIED;

(3)     Defendants Leon, Scott, Sanders, and Watt's motion for summary judgment on the plaintiff's Fourth Amendment excessive force claims against them on the basis of qualified immunity be DENIED;

(4)     Defendants Leon, Scott, Sanders, and Watt's motion for summary judgment on the plaintiff's Fourth Amendment failure to protect claims against them be DENIED;

(5)     Defendants Leon, Scott, Sanders, and Watt's motion for summary judgment on the plaintiff's Fourth Amendment failure to protect claims against them on the basis of qualified immunity be DENIED;

(6)     Defendant Hughes' motion for summary judgment on the plaintiff's Fourteenth Amendment excessive force claim be DENIED;

(7)     Defendant Hughes' motion for summary judgment on the plaintiff's Fourteenth Amendment excessive force claim against him on the basis of qualified immunity be DENIED; and

(8)     The plaintiff's motion for summary judgment be DENIED.

Any party who objects to this report and recommendation must, within fourteen (14) days of the date on which it is entered, file specific written objections with the clerk of this court. **Any objections to the failure of the magistrate judge to address any contention raised in the petition also must be included.** Failure to do so will bar any later challenge or review of the factual findings of the magistrate judge, except for plain error. *See* 28 U.S.C. § 636(b)(1)(C);

*Thomas v. Arn*, 474 U.S. 140, (1985), *reh'g denied*, 474 U.S. 1111 (1986); *Dupree v. Warden*, 715 F.3d 1295, 1300 (11th Cir. 2013).

To challenge the findings of the magistrate judge, a party must file with the clerk of the court written objections which shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection.   Any objections to the failure of the magistrate judge to address any contention raised in the complaint also must be included.   Objections not meeting the specificity requirement set out above will not be considered by a district judge.   The filing of objections is not a proper vehicle through which to make new allegations or present additional evidence.   Furthermore, it is not necessary for a party to repeat legal arguments in objections.   A copy of the objections must be served upon all other parties to the action.

On receipt of objections meeting the specificity requirement set out above, a United States District Judge shall make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the magistrate judge.   The district judge, however, need conduct a hearing only in his discretion or if required by law, and may consider the record developed before the magistrate judge, making his own determination on the basis of that record.   The district judge may also receive further evidence, recall witnesses or

29

recommit the matter to the magistrate judge with instructions.   Objections not meeting the foregoing specificity requirement will not be considered by a district judge.

A party may not appeal a magistrate judge's recommendation directly to the United States Court of Appeals for the Eleventh Circuit.   Appeals may be made only from a final judgment entered by or at the direction of a district judge.

The Clerk is DIRECTED to serve a copy of this report and recommendation upon the plaintiff and counsel of record.

**DATED**, this 10th day of June, 2015.

JOHN E. OTT
Chief United States Magistrate Judge